# Minto *v.* Moore.

## *Assumpsit.*

(Decided May 11, 1911.   55 South. 542.)

1. *Brokers; Real Estate; Sale; Employment and Authority.*—In the absence of a special agreement a real estate broker has no power to conclude a sale, but the general authority of such broker is only to find a purchaser willing to buy on the terms fixed by the owner.

[Minto v. Moore.]

2. *Same; Commission From Purchaser.*—Under the facts in this case the broker was as a matter of law acting as agent of the owner, and though he may not have understood his relation to the owner, the purchaser was not liable for his commission on the acceptance of his offer.

3. *Same; Duty as to Principle; Parties Adversely Interested.*— A broker acting for the vendor in the sale of real estate cannot act for the purchaser in the same transaction, since that would put him between conflicting interests.

4. *Principal and Agent; Relation; Implied Agency.*—Where the facts establish the relation of principal and agent as a matter of law, the intention of the parties becomes immaterial, and the relation is not affected by any agreement of the parties that an agency does not exist, or that some other relation does not exist.

5. *Same; Joint or Several Agents.*—One principal may appoint several agents to act for him in the same matter, each to act separately, and under such circumstances, they are separate and not joint agents.

6. *Vendor and Purchaser; Recission by Purchaser;Particular Requirement.*—Where a person contracts with the agent of the owner for the purchase of real property and the agent knows that it is to be a cash transaction and that the purchaser desires the property for a home and cannot brook a delay of six or seven months, the purchaser has a right to rescind the contract upon the discovery of a mortgage upon the property which the owner has not the present right to discharge, and this whether the parties knew or did not know of the existence of the mortgage.

APPEAL from Mobile Law and Equity Court.

Heard before Hon. SAFFOLD BERNEY.

Action by Terry L. Moore against Mrs. Mary E. Minto. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Action to recover broker's commission in the sale of real estate. The first and second counts were on account and for work and labor done. The other counts allege a breach of agreement entered into between Terry L. Moore & Co., a partnership consisting of Terry L. Moore and Theo. S. Moore, and the defendant, on August 9, 1909, by which defendant promised to pay said Moore & Co. the sum of $400 if they would obtain from E. L. Johnston an acceptance of defendant's offer to purchase the residence of said Johnston, a description of which appears in the count. It is then averred that T.

[Minto v. Moore.]

L. Moore & Co. did obtain on August 10, 1909, from said Johnston, an acceptance of said offer within the price authorized by defendant, and that said Moore & Co. did immediately notify the defendant that they had closed said deal with said Johnston; but on August 28, 1909, the defendant notified the said Moore & Co. that the offer made by her was withdrawn and annulled, and she has ever since refused and declined to pay said $400, or any part thereof. It is then alleged that the plaintiff was the owner of the claim sued on. There were other counts setting up that the defendant employed and requested the said Moore & Co. to purchase Johnston's residence for her at a named price, and that pursuant to said employment and instruction said Moore & Co. obtained from said Johnston an agreement to sell his said residence within the price named by the defendant, Then follows the declaration of withdrawal, etc., as in the other counts, and an allegation that reasonable commission for such service was $400. The controverted facts appear in the opinion of the court. A good many exceptions to evidence were assigned, but it is not deemed necessary to here set them out. The issue joined was the general issue, as no other pleas appear in the record.

FITTS & LEIGH, for appellant. A right to a good title is not a right growing out of the agreement of the parties but one given by law.—*Oglevy v. Foljambe,* 3 Mere. 53. Where an encumbrance is discovered previous to the execution of the conveyance, the vendor must be able to discharge it.—Suggden on Vendors, Sec. 4, 315; *Romncly v. James,* 6 Taunt. 263; *Maberly v. Robbin,* 5 Taunt. 625; *Cullom v. Branch Bank,* 4 Ala. 28; *Flinn v. Tarver,* 64 Ala. 199; 2 Kent 373; *Bir. L. & L. Co. v. Thompson,* 86 Ala. 150; *Sayre v. Wilson,* 86 Ala. 157. The offer of Mrs. Minto meant nothing other than that

[Minto v. Moore.]

she would buy if the title was good, and on discovering the encumbrance she had a right to rescind.—*Rider v. Johnson,* 153 Ala. 486. If the proposed seller was not able to comply with the terms, then Moore as the agent of the defendant was not entitled to his commission, as under the above authorities she had a right of rescission and even if Moore was her agent she could revoke the agency.—*Bailey, McConnell & Howell v. Smith,* 103 Ala. 641; 179 Mass. 474; 66 L. R. A. 985. The court erred in permitting it to be shown that plaintiff told defendant that he had straightened out the tax on the property and had forwarded the power of attorney to Europe.—*Abercrombie v. Allen,* 29 Ala. 281; *Deen v. The State,* 105 Ala. 21; Greenleaf, Sec. 197; Wigmore, Sec. 1071.

WEBB & McALPINE, for appellee. Counsel discuss assignments of error relative to evidence, but without citation of authority. They insist that under the facts in this case there was no right of rescission in the purchaser, and that having performed his part of the contract with the purchaser, the broker was entitled to his commission.—*Rider v. Johnson,* 153 Ala. 482; *Griggs v. Woodruff,* 14 Ala. 9; *Walling v. Thomas,* 133 Ala. 426; 29 A. & E. Enc. of Law, 669, 675, 677-8.

DE GRAFFENRIED, J.—In the present case the appellee, a real estate agent residing in Mobile, contends that appellant agreed to pay him $400 if he would purchase for her a certain house and lot in the city of Mobile from one Johnston for a certain sum; that thereupon he undertook, as appellant's agent, to buy the property for appellant; that finally, on August 10, 1909, through his negotiations, a contract was entered into between appellant and Johnston for the amount which

appellant had authorized him to offer; and that after-
wards, on August 28, 1909, the appellant, without legal
justification, repudiated the contract, and refuses to pay
appellee the $400 for his services. The evidence shows,
without conflict, that appellee was to receive no compen-
sation if the contract of August 10, was not binding up-
on appellant. It also shows, without conflict, that it
was to be a cash transaction, and that appellee knew
that appellant desired the property for a home, and that
her circumstances would not admit of delay in closing
the trade.

In addition to the express declarations of appellee,
which we hereafter quote from his testimony, the cir-
cumstances surrounding this entire transaction point
strongly to the fact that, during all of the negotiations
which finally resulted in this litigation, the appellee was
acting as the agent of the vendor, and not of the appel-
lant, the vendee. The appellee was to furnish the ab-
stract of title, to be passed upon by the appellant's at-
torneys. "It had," says appellee, "to net Johnston
$7,800, and the expense of the abstract had to come out
of the $400 commission. I spent something like $40 for
the abstract." Messrs. Fitts & Leigh were the attorneys
of the appellant during the transaction, and on his
cross-examination the appellee said, among other things,
"It was a fact that he was to pay all the expenses of
making the abstract and examining it"; then said he
was not to pay Messrs. Fitts & Leigh for examining it,
*"No, sir; that's the purchaser's business."* The conclu-
sion is irresistible that it was the custom among real
estate men in Mobile for the vendor to furnish and pay
for the abstract, and that it was the *purchaser's* busi-
ness to pay his attorneys for examining it. The appel-
lee, in furnishing the abstract to appellant for examin-
ation by her attorneys, was performing the usual and

customary obligation of a *vendor* to a vendee.  He was doing that which custom required Johnston to do.  The witness further testified that the negotiations for the purchase of the property began as follows:  "That on or about August 9, 1909, this plaintiff had a conversation with Mrs. Minto's son relative to the purchase by her of a piece of real estate."  Further testifying, witness said the son asked him to go and see his mother, "and she said if I would wait until the following Saturday, she would go with me to see the houses *I had.*  On the following Saturday, I went there about 3 o'clock in the afternoon to look for some houses.  She said, 'I want to get me a house, and I want you to look for it and get it.'  We went to see the Creary house, Dr. Johnston's house, and one out on Monterey street.  She liked the Johnston house, and wanted me to purchase it for her."  Later, on August 9th, the appellant wrote appellee a letter as follows:  "I hereby make *you* an offer of $8,200 for Dr. E. L. Johnston's residence on South Selma street, third east of Ann street, Mobile, Alabama. Yours truly, Mrs. H. M. Minto."

That letter indicates, not that Mrs. Minto was dealing with her agent, conferring an authority to *buy,* but that she was dealing with Dr. Johnston's agent, with authority to *sell.*  When, on August 21st, she received from Fitts & Leigh an opinion showing defects in the title, she sent that opinion showing defects in the title, not to Dr. Johnston, but to appellee, to whom she had written the letter of August 9th, and a perusal of the letter of August 28th, written by appellant to appellee, and which was prepared by Mrs. Minto and her attorneys, will convince the most incredulous that Mrs. Minto regarded the appellee as the *agent of the vendor.*  In addition to all this, when the opinion showing defects in the title was sent to appellee, he immediately

[Minto v. Moore.]

proceeded to remove the tax liens, incumbrances upon Dr. Johnston's title.

While, in his testimony, appellee offers explanations as to the above matters, the following extracts from his testimony cannot be explained consistently with any hypothesis other than that he was Dr. Johnston's agent. Referring to this property, he says: "There were a dozen real estate men trying to sell the property at the same time; that no real estate agent had it in hand; that Johnston would not let any one have it directly; that he had written letters to all of the agents in town asking *them to sell it."* Appellee was *one of those* agents to whom one of those letters had been written. Speaking of the·same subject, in another part of his testimony, he says: "I did not have it on my books, but I knew it was on the market. There were about 12 real estate men *trying to sell it.* We knew it was on the market, and were all hunting a purchaser for it." Appellee was, pursuant to his authority from Dr. Johnston's letter, to use his expressive, if inelegant, language, "hunting a purchaser for it" when he introduced appellant to it. His own language and conduct fixes his true position in this matter. He was Dr. Johnston's agent, and as such conducted the negotiations with appellant.

"In the absence of a special agreement, the general authority of a real estate agent is only to find a purchaser, and to report him to the owner, and he has no power to conclude a sale."—*Hamilton v. Cutts,* 6 Mackey (D. C.) 208. "His business generally is only to find a purchaser who is willing to buy the land on the terms fixed by the owner. He has no authority to bind the principal by signing a contract of sale."—*McCullough v. Hitchcock,* 71 Conn. 401, 42 Atl. 81.

[Minto v. Moore.]

"If the facts establish the relation of principal and agent as a matter of law, the intention of the parties is immaterial, and the character of the relation is not affected by any agreement of the parties that an agency between them does not exist or that some other relation does exist."—31 Cyc. 1191. "The position of the secretary must be determined by his actual power and authority, and not by the name which the defendant chooses to give him. To invest him with the duties of an agent, and to deny his agency, is a mere juggling with words. Defendant cannot thus play fast and loose with his own subordinates. Whether one is an agent of another is a question of mixed law and fact, depending on the authority given expressly or impliedly. The real fact, as it existed, cannot be hidden in this manner; much less can it be destroyed, and something that did not in reality exist be placed in its stead. The substance is superior to the mere drapery of words with which one party wishes to bring into existence and clothe with an unreal authority."—*Supreme Lodge Knights of Pythias v. Josephine R. Withers*, 177 U. S. 260, 20 Sup. Ct. 611, 44 L. Ed. 762.

A principal may appoint a number of agents to act for him in the same matter, each to act separately, and in such case they are several agents and are to act severally.—31 Cyc. 1412; *Cook Bros. v. Forst*, 116 Ala. 395, 22 South. 540; *Hutto v. Stough & Hornsby*, 157 Ala. 566, 47 South. 1031.

The mere fact that many other real estate men were trying to find a purchaser for the property at Dr. Johnston's request, and that the property *had not been listed* by appellee, does not affect the proposition. It is sufficient to say that when appellant entered into negotiations with appellee, looking to a purchase of this land, he was, under authority from Dr. Johnston and in his

capacity as a real estate agent, attempting to find a purchaser for the property. He was obtaining for that property a prospective purchaser when he obtained from appellant her offer, above quoted, of August 9th, and he introduced the prospective purchaser to his principal, Dr. Johnston, when, on August 10th, he wrote him, making the offer of $7,800 net for the property, which was the amount offered by appellant less an amount which approximated the usual commissions charged by real estate agents in Mobile for negotiating sales.

As appellee, in conducting the negotiations, was the agent of the vendor, he was not, and could not have been, the agent of the appellant for that purpose. "One cannot act as agent for both the buyer and the seller in the same transaction, since it is to the interest of the vendor to secure the highest price and the purchaser to pay the least, and the agent thereby puts himself in a conflicting position."—31 Cyc. 1448, and authorities cited. The above is but the expression of the ancient, but ever-living, principle that "a servant cannot serve two masters."

It therefore follows that, if the appellant employed appellee to buy the property, his position was such that he could not legally accept the employment, and he was and remained, throughout the transaction, the agent of the vendor, and his acts and declarations must be so considered. While the appellee, not having formally listed this property on his books for sale, may not have understood his relations to Dr. Johnston, the law understood them, and precluded him from acting for a person who desired, through him, to buy the property; and while he may, in good faith, as testified by him, have been of the opinion that he was in a position to represent appellant, the law fixed his status and disqualified him from doing so. In the present instance, an excellent

[Minto v. Moore.]

bargain may have been driven on behalf of appellant; but it was a bargain which, under the policy of the law, ·the appellee, owing to his situation with reference to the property, had no legal right to make.

Nothing in the views above expressed is in conflict with the questions actually determined by our Supreme Court in *Stevens v. Bailey & Howard,* 149 Ala. 256, 42 South. 740. In that case it was agreed that Bailey & · Howard, according to the testimony of the defendant, "could get no commissions out of the defendant, Stevens; that Stevens was to get $8,000 out of the property free of commission; that he gave Howard the right to sell the property at $8,000, the other party to pay the commission; that the purchaser was to pay the commissions, if he was paid; that plaintiffs several times asked defendant if he would pay commissions on the sale, and that defendant always declined to do so; that he always stood to his first statement, that he was to have $8,000 free of charges; and that witness always told Howard that he must look to the other man for pay." In the above case, Bailey & Howard, as real estate agents, found the defendant a purchaser for $8,250, who was ready, able, and willing to pay said sum. Defects were found to exist in the title to the property, and the defendant failed to cure the defects, and the trade was never consummated. Howard & Bailey sued the defendant, Stevens, for $250 excess over the $8,000, and the Supreme Court held that, if the above-quoted statement of the testimony of Stevens was correct, he was not liable to pay commissions, and properly so. There was an express agreement between the real estate agents and the defendant, if Stevens' testimony was true, that he was in no event to pay them any commissions, but that he was to look entirely to the purchaser.

There was, on August 10, 1909, a mortgage on the property for $7,000 to one Willis, bearing interest at the rate of 7 per cent. per annum, and which did not mature until April, 1910. Willis was in Paris, France, and the testimony does not disclose when, if ever, he would be in Mobile. The appellant claims that she knew nothing of the existence of this mortgage until she learned of it through her attorneys, Fitts & Leigh, on August 21, 1909. It is evident, as this was to be a cash transaction, and as appellee knew, when the contract of August 10th was made, that appellant desired the property for a home, and that her circumstances were such as not to admit of delay to April, 1910, for the execution and delivery of a conveyance, that appellant, upon the discovery of the existence of the mortgage, had the right, by seasonable action, to annul the contract, unless Johnston had the present right to discharge the mortgage, or unless, after the discovery of the existence of the mortgage, with a full knowledge of all the facts, she did something to estop her from so doing.

It is also evident that if she made the contract with a knowledge of the existence of the mortgage, but under the belief, from information received from appellee, that Johnston had the present right to discharge the mortgage, she had the right to seasonably annul the contract if, after the contract was made, she discovered that Johnston had no present right to cancel the mortgage and that Willis was not bound to accept payment until April, 1910. If she knew of the existence of the mortgage, and made the contract under the belief, created by information received from appellee, that all that was necessary to be done was for a power of attorney to be sent to Willis for his signature, which Johnston had the right to demand of him as a matter of right, and

[Minto v. Moore.]

she afterwards discovered that no such right existed, then, upon such discovery, she had a right to annul the contract. Neither good morals nor the law, required her to wait while the appellee and his principal speculated upon what Willis would do with a power of attorney sent to him, and to which they had no right to demand his signature.

A candid reading of appellee's testimony indicates that he was, during the entire pendency of these negotiations, laboring under the impression that his principal, Dr. Johnston, had the right to presently pay the Willis mortgage, and that all that was necessary to be done in the premises was for a power of attorney to be mailed to Willis for his signature in Paris; in other words, that Johnston had the present right to demand the cancellation of the Willis mortgage, and it is only upon this theory that his various statements shown by his own testimony, made to appellant, can be consistently explained. His entire testimony shows that he led appellant to believe, if he did inform her of the mortgage, that Dr. Johnston had the present right to pay the mortgage debt and have the mortgage canceled. In one place he says: "I told her that there was a mortgage on the Johnston place to a Mr. Willis, that he was in Paris, and that we would have to go over to Blocker Thornton to get a power of attorney." In another place he says that he told her: "That the power of attorney had been forwarded to Mr. Willis by Thornton—that this was perhaps on the same day that the taxes were staightened up." The taxes were straightened up, as shown by the receipts in evidence, on August 24th and 25th. In another place, he says that he told the appellant: "We expected to close the matter up in a few days, just as soon as we could hear from Mr. Willis."

In addition to his own testimony, the appellee introduced Fitts as a witness in his behalf, and, while there is a serious conflict between Fitts and appellee on many subjects, there are two statements contained in Fitts testimony which neither the appellee nor any one else denies. Fitts states that after August 21st he saw appellee, and that appellee said to him "that Mr. Blocker Thornton had power of attorney to attend to Mr. Willis' business, that Mr. Willis was in Europe, and that under the power of attorney Mr. Thornton could cancel the mortgage for $7,000." Witness said that "he saw Mr. Blocker Thornton at a subsequent time, and that Mr. Thornton did not have any power of attorney to cancel the mortgage; that is, that Mr. Thornton said that he did not." The witness Fitts further testified that after the 28th day of August Thornton came to him with an unsigned power of attorney, to be sent to Willis in Europe, to cancel the mortgage.

While the appellee led the appellant to believe, during the pendency of the negotiations, that Dr. Johnston had the present right to pay off and discharge the Willis mortgage, there is absolutely no evidence in the record tending to show that Dr. Johnston did have that right, and while appellee led appellant to believe, during a pendency of the negotiations, that a power of attorney had been forwarded to Willis for his signature, there is no evidence whatever in the record tending to show that any such power of attorney had in fact been forwarded. The above testimony of Fitts, on the contrary, shows that none had been forwarded up to August 28th. While appellant testifies that Dr. Johnston was willing to keep possession of the residence at a rental of $65 per month until November 1st, and was willing to pay the interest on the mortgage until it was duly canceled, there is nothing in the record tending to show

[Rarden v. Salter.]

that appellant could have received an unincumbered title to the property until April, 1910.

For the above reasons, the appellant had the legal right on August 28th to annul the contract of August 10th. Neither reason nor law, as stated above, required that she should wait until the appellee could forward to Paris, France, a power of attorney upon the mere hope that Willis would sign it, when neither appellee nor his principal, Dr. Johnston, is shown by the evidence to have had the legal right to demand his signature. Under all the evidence in this case, with all of its conflicts, we are constrained to hold that the appellee is shown conclusively to have acted during these negotiations as the agent of the vendor, and that appellant, when she annulled the contract of August 10th, was acting within her legal rights. There is no necessity for us to discuss any of the other questions presented by the record.

The general charge asked by the appellant should have been given.

Reversed and remanded.